# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DEBORAH J. LIVINGSTON, individually, and on behalf of others similarly situated, | : : : : | |
| | : | 1:20-cv-1030 (GTS/DJS) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TRUSTCO BANK, A FEDERAL SAVINGS BANK, and DOES 1 through 100, | : : : | August 31, 2020 |
| | : | |
| Defendants. | | |

---

## CLASS ACTION COMPLAINT

---

Plaintiff Deborah J. Livingston, by and through her attorneys, brings this class and representative action against Trustco Bank, A Federal Savings Bank and DOES 1 through 100 (collectively "Trustco" or "Defendant").

## NATURE OF THE ACTION

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff's or her counsel's personal knowledge, as well as Plaintiff's or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all other persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public.

1

Defendant wrongfully charged Plaintiff and the Class Members fees related to their checking accounts.

3.    This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, Defendant's policy and practice to maximize the fees it imposes on members.  This conduct includes but is not limited to, assessing an overdraft fee on transactions when by Defendant's own calculations there was enough available money in the checking account to cover the transaction at issue when authorized and the money was specifically sequestered for that transaction but would be assessed an overdraft fee anyway. The charging of such fees breaches Defendant's contracts with its members, who include Plaintiff and the members of the Class.

4.    The charging for such fees also violates federal law.  Defendant failed to follow basic prerequisites in its overdraft fee system as required by Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*), which include, *inter alia*, providing a separate overdraft fee contract that describes the actual overdraft and non-sufficient funds practice used by Defendant, which may be rejected by the customer, and only collecting fees in the manner described by the fee contract.  Regulation E prohibits Defendant from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)) if it does not meet the Regulation E prerequisites, but Defendant did charge overdraft fees without meeting the Regulation E prerequisite.

## PARTIES

5.    Based on information and belief, Defendant is and has been a federal savings bank with its headquarters located in Glenville, New York, and has assets of more than $5.2 billion, and 148 branch locations in five states. Defendant is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

6.    Plaintiff is a resident of Celebration, Florida and had a checking account with Defendant at all times relevant to the class action allegations.

7.    Without limitation, defendants DOES 1 through 100, include agents, partners,

joint ventures, subsidiaries and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant branch locations.  Each of defendants DOES 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).  As used herein, where appropriate, the term "Defendant" and "Trustco" are also inclusive of Defendants DOES 1 through 100.

8.      Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

9.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.     At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

12.     As to the conduct alleged herein, each act was authorized, ratified or directed by

Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

13.     Venue is proper in this district as Defendant's, among other reasons, pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District.

14.     This Court has jurisdiction over this case, among other reasons, pursuant to 28 U.S.C. § 1331 and § 1332(d).

## CLASS REPRESENTATION ALLEGATIONS

15.     Defendant offers its consumer banking customers a checking account.  One of the features of the checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a Trustco checking account include the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

16.     Overdraft fees and Non-Sufficient Funds Fees ("NSF" fees) constitute the primary fee generators for banks.  According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees.

17.     Since 2000, the average dollar amount of a checking account transaction has become much lower because customers, and especially younger customers, use debit cards instead of cash or credit cards for everyday purchases.   In 2016, the number of terminals that accept debit cards in the United States had increased by approximately 1.4 million compared to 2011.[1]   That has translated to the average dollar amount of overdraft transactions being lower than in 2000.  However, while the average overdraft transaction is substantially lower and provides much less risk and exposure to the bank, the average cost of overdraft fees per transaction has gone up.

---

[1] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016,   http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23 (last visited March 7, 2019).

18.    The high cost of an overdraft fee is also usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

19.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id*. at p. 3).

20.    As a result of banks taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The rulings of these cases have predominantly fallen in favor of consumers, forcing the banks to repay their customers significant amounts of wrongfully collected overdraft fees.

21.    The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

22.    To qualify as affirmative consent for the Regulation E program, the Opt-In

Contract must include, but is not limited, to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day (if there is no maximum, that fact must be stated);

- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available.

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted-in to the overdraft program.

23.    If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, including fulfilling each of the above requirements, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.  On information and belief, although formal discovery will be required to confirm this, Defendant did not fulfill these Regulation E prerequisites. The requirements which it did not fulfill, on information and belief, include, *inter alia*, in its actual Overdraft Protection contract document, failing to correctly describe the program pursuant to which Defendant actually assessed these overdraft fees, failing to abide by its terms, and also using it as an impermissible marketing vehicle.

24.    An accounting gimmick related to increasing overdraft and NSF fees used by some financial institutions, which on information and belief financial institutions such as Defendant may use, is an "approve positive – post supposedly negative" ("APPSN") method of calculation. It works as follows. At the moment debit card transactions are authorized on an

account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount.  As a result, customers' accounts will always have sufficient available funds available to cover these transactions.

25.     However, Defendant still assesses $36 overdraft fees on many of these transactions and mispresents its practices in its account documents. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses overdraft fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

26.     Additionally, and adding confusion to the matter, it appears Defendant mis-uses and mixes up the terms "overdraft fee" and "NSF fee," not using the terms correctly to reflect the actual action taken by Defendant, or actual nature of the transaction.  In other words, it appears Defendant may improperly be calling "overdraft fee" transactions instead "NSF fee" transactions.  Therefore, while Plaintiff references "overdraft fee", Defendant in its account statements might erroneously be labeling these as "NSF fees."

27.     Defendant maintains a running account balance in real time, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made.  When a customer makes a purchase with a debit card, Defendant subtracts the dollar amount of the transaction from the customer's available balance and places such funds on a hold.  Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

28.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions.  Accordingly, many subsequent transactions incur overdraft fees due to the unavailability of the funds sequestered for those debit card transactions.

29.     Still, despite keeping those held funds off-limits for other transactions, Defendant improperly charges overdraft fees (and possibly erroneously calls them NSF fees) on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

30.     The Consumer Financial Protection Bureau in its Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights" has expressed concern with this very issue, calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.  Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above.  Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged.  Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions.  Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status.  But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures.  Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive.  Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

31.     There is no justification for these practices, other than to maximize Defendant's fee revenue.  APPSN transactions only exist because intervening checking account transactions

supposedly reduce an account balance.  But Defendant is free to protect its interests and either reject those intervening transactions or charge overdraft fees on those intervening transactions—and it does the latter to the tune of millions of dollars. But Defendant was not content with these millions in overdraft fees. Instead, it sought millions *more* in overdraft fees on these APPSN Transactions.

32.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in Defendant's adhesion contracts—contracts which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. These practices also exploit contractual discretion to gouge consumers. In short, Defendant is not authorized by contract to charge overdraft fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

### **Mechanics of a Debit Card Transaction**

33.     A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant.  When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

34.     At this step, if the transaction is approved, Defendant immediately reduces the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

35.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations: "When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days

after authorization, those funds may be unavailable for the consumer's use for other transactions." Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 25, 2009).

36.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account. Defendant decides whether to "pay" debit card transactions at authorization. If it decides to pay, after that, Defendant is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when Defendant may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009). Notably, there is no change—**_no impact whatsoever_**—to the available funds in an account when this step occurs.

**Trustco's  Account Contract**

37.     Plaintiff has a Trustco checking account, which is currently governed by Trustco's General Disclaimer - Trustco Bank Retail Online Banking, Bill Paying and Mobile Banking Agreement, and Electronic Fund Transfers Disclosure Agreement (the "Account Agreement"). It is attached as Exhibit 1. The Account Agreement and relevant contract documents covering overdraft fees provide that Defendant will not charge overdraft fees on transactions that have sufficient available funds to cover them at the time they are initiated.

38.     For debit card transactions, this moment occurs at the moment of authorization. For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet Defendant assesses overdraft fees on them anyway (and may erroneously mis-label them as "NSF fees").

10

39.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance.  Of course, that is not true for APPSN transactions.   In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions.  Instead, it uses the secret posting process described below.

40.     Defendant charges overdraft fees even when sufficient funds exist to cover transactions that are "initiated and authorized" into a positive balance.  No express language in any document states that Defendant may impose overdraft fees on any APPSN Transactions.

41.     The account documents misconstrue Defendant's true debit card processing and overdraft practices.  First, and most fundamentally, Defendant charges overdraft fees on debit card transactions for which there are sufficient funds available to use to cover the transactions.

42.     Defendant assesses overdraft fees on APPSN Transactions that **do** have sufficient funds available to cover them throughout their lifecycle. Defendant's practice of charging overdraft fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so.  This discrepancy between Defendant's actual practice and the contract causes consumers like Plaintiff to incur more overdraft fees than they should.

43.     Sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice. These withdrawals take place upon initiation and thus they cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batching posting process.

44.     In reality, Defendant's actual practice is to attempt the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.   At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, Defendant cannot then charge an OD fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

45.     Upon information and belief, something more is going on: at the moment a debit

card transaction is getting ready to settle, Defendant does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, and then re-debits the same transaction a second time.

46.     This secret step allows it to charge overdraft fees on transactions that never should have been subject to them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay them.   This discrepancy between Defendant's actual practices and the contract causes accountholders to incur more overdraft fees than they should. In sum, there is a huge gap between Defendant's practices as described in the account documents and Defendant's practices in reality.

47.     The assessment of overdraft fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

48.     Defendant was and is aware that this is precisely how its members reasonably understand debit card transactions to work.  Defendant knows that many consumers prefer debit cards for these very reasons.  Consumer research indicates that consumers prefer debit cards as a budgeting device because they do not allow debt like credit cards do.

49.     On information and belief, although access to Defendant's database will be sought by Plaintiff to confirm, Plaintiff was charged such inappropriate APPSN fees at least on the following occasions. On January 9, 2019, when Plaintiff's balance was a positive $11.03, Defendant approved a transaction of $4.33 and sequestered the money for that transaction, yet the next day, on January 10, 2019, Defendant charged Plaintiff a $36 insufficient funds fee on this $4.33 transaction.  As another example, Defendant imposed a $36 "prior day" insufficient funds fee even though Plaintiff had a positive balance when this transaction was approved and

12

Defendant sequestered the money for this transaction when it approved it.  As another example, Defendant imposed a $36 insufficient funds fee on Plaintiff on March 5, 2019 for a transaction Defendant had approved and sequestered the money for that transaction when Plaintiff had a positive balance. As another example, Plaintiff was charged a $36 fee on October 2, 2018, for a transaction which had been authorized and the money for it sequestered by Defendant when Plaintiff had a positive balance with enough money available to cover the transaction.

50.     Defendant has no authority to use an APPSN calculation to assess overdraft and NSF fees in its contract with its customers, and such practices breach its contracts with its customers and are also deceptive, unfair, and unconscionable.  These practices exploit any contractual discretion Defendant may have in its contracts with its customers in an unreasonable way that adds to Defendant's profits and harms its customers. Defendant does not describe this APPSN procedure in its contracts.  Instead, the Account Agreement explains in Section 59 as follows:

> **Overdrafts**. Customer agrees to initiate or schedule all transfers or payment transactions only when there are or will be sufficient Available Funds in the Account for that transfer or payment. The completion of any transfer or payment order is subject to sufficient Available Funds in the Account at the time the transaction is posted. If Customer's Account has insufficient Available Funds to perform any fund transfer Customer has requested for a given Business Day, Bank may either pay or return it. Bank is not required to provide notification to Customer in any form that the transfer or payment order was not honored, and it is Customer's responsibility to make other arrangements to facilitate the processing of the transaction or payment by other means, which may include rescheduling or reinitiating the transaction in Online Banking. Customer agrees to pay the outstanding overdraft and any fee(s) associated with the overdraft in accordance with Bank's Fee Schedule, whether the item is paid or returned. The honoring of one or more of Customer's overdrafts, however, does not obligate Bank to honor any future overdrafts. Bank may assess a fee to Customer's Account for processing an item that is presented for payment for which there are no funds, insufficient funds or unavailable funds.

51.     This APPSN gimmick also breaches Defendant's second contract at issue, the Regulation E required contract, the Opt-In Contract.  Discovery will be necessary to obtain this contract from Defendant.

52.     On information and belief, the above examples of damages transactions are just a

13

few examples, and Plaintiff believes that Defendant's database will reveal numerous other and different examples of the improper charging of such fees by Defendant.

53.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts. Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys in or about July 2020.  While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until about July 2020, because Defendant hid its actual practice from its members by describing a different practice in its contracts.  It also mis-labeled fees and made it next to impossible for a reasonable person to understand which fees applied to which transactions or were authorized, or that Defendant had violated obscure federal laws, including Regulation E.  This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop Defendant.

54.     Plaintiff and the class members were harmed by these practices when they were assessed such fees when they should not have been.  A complete evaluation of Defendant's records is necessary to determine the full extent of Plaintiff's harm from this practice.

55.     Plaintiff bring this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

**Class One:  The APPSN Class**

> **All United States residents who have or have had accounts with Trustco who incurred an overdraft fee on a transaction that was authorized into a positive available balance beginning six years preceding the filing of this Complaint and ending on the day the class certification is granted.**

*///*

**Class Two:**  **The Regulation E Class**

> **All United States residents who have or have had accounts with Trustco who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the day the class certification is granted.**

56.     Excluded from the Classes are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class Members.

57.     Plaintiff can identify and ascertain all other class members from Defendant's business records. Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's members have been harmed by its practices and thus qualify as Class Members.  Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications. Thus, Plaintiff's classes are ascertainable.

58.     **Numerosity** – Plaintiff does not know the exact size of the class because this information is in Defendant's exclusive control. However, based on Trustco having assets of more than $5.2 billion, and 148 branch locations in five states, numerosity will be met, and joinder of all class members would be impracticable.

59.     **Typicality** – Plaintiff's claims are typical of all of the members of the Class.  The

evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Account Agreement and Opt-In Contract, were identical as to all relevant terms, and also because, inter alia, the challenged practices of charging customers for improper fees are uniform for Plaintiff and all Class Members.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

60. **Commonality** – Questions of law and fact common to the Class(es) exist and predominate over questions affecting only individual members, including, inter alia, the following:

a. Whether the Account Agreement contracted for Defendant to charge an overdraft/NSF fee based on an APPSN calculation;

b. Whether the Opt-In Contracted was ambiguous on whether Defendant would use an APPSN calculation for assessing overdraft/NSF fees;

c. Whether Defendant abided by its funds availability policy;

d. Whether the contracts are ambiguous on what fees will be charged under what circumstances, or referred to inconsistently;

e. Whether Defendant complied with Regulation E.

61. **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and her counsel intend to prosecute this action vigorously.

62.   **Predominance and Superiority** – The matter is properly maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

63.   Plaintiff does not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her

claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because both Defendant resides in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

64.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

65.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

      a.   Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

           1.   Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

           2.   Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making

           appropriate final injunctive or corresponding declaratory relief
with respect to the Class as a whole.

   b. Common questions of law and fact exist as to the members of the Class and
predominate over any questions affecting only individual members, and a
class action is superior to other available methods of the fair and efficient
adjudication of the controversy.

**<u>FIRST CAUSE OF ACTION</u>**

**(Breach of Contract)**

66.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

67.    Plaintiff and each of the Class Members entered into an Account Agreement with Defendant covering the subject of overdraft transactions.  This contract was drafted by and is binding upon Defendant.

68.    Nowhere did the Account Agreement state that Defendant would sequester money upon authorization for a transaction and not allow it to be used for anything else, but then charge an overdraft fee at the time of the posting of the same transaction when there had been enough money to cover the transaction when the money had been sequestered for it.  Further, in the contracts Defendant promised that it would assess fees only when the transaction caused the available balance to fall below zero.  Additionally, the operative contracts governed which fees could be charged and under which circumstances, and Defendant breached these contracts by charging fees under circumstances not permitted by the contracts.

69.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing

19

or which were waived or excused by Defendant's misconduct.

70.     As a proximate result of Defendant's breaches, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

71.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

72.     Plaintiff and each of the Class Members entered into contracts with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account Agreement contract which covers overdraft fees and NSF fees. The contracts were drafted by and are binding upon Defendant.

73.     Nowhere in its contracts did Defendant state that it would sequester funds for a transaction and thereby reduce the "available balance" by the amount of sequestered funds, yet nonetheless charge a fee at the time of the positing of the transaction despite already having set those funds aside.

74.     Good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

75.     The material terms of the contracts therefore included the implied covenant of

20

good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

76.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

77.     Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, when after sequestering funds for a particular transaction and not making them available for any other use, Defendant nonetheless at the time of posting charged an overdraft fee on that same transaction for which funds already had been set aside. Defendant unilaterally elected to and did program its software to create this accounting gimmick which would maximize its overdraft and NSF fees.  In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class Members of the full benefit of the contracts.

78.     As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION
**(Unjust Enrichment/Restitution)**

79.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

80.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

81.     Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees and repeat NSF and other fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

### FOURTH CAUSE OF ACTION
**(Money Had and Received)**

82.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

83.     Defendant has obtained money from Plaintiff and the Class Members by the exercise of imposition, coercion, undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

84.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

### FIFTH CAUSE OF ACTION
**(Violation of Electronic Fund Transfers Act (Regulation E)**
**C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))**

85.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

86.     By charging overdraft fees on ATM and nonrecurring transactions, Defendant

violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection

of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer

Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is

also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

87.     Specifically, the charges violated what is known as the "Opt-In Rule" of Reg E.

(12 C.F.R. §1005.17.)  The Opt-In Rule states:  "a financial institution ... *shall not assess a fee or*

*charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the

consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft*

*service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*"

to enter into the overdraft program (*Id*.)  The notice "shall be clear and readily understandable."

(12 C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial

institution must provide a segregated description of its overdraft practices that is accurate, non-

misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must

provide its customers a reasonable opportunity to opt-in after receiving the description.  The

affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the

financial institution must provide confirmation of the opt-in in a manner that conforms to 12

C.F.R. § 1005.17.

88.     The intent and purpose of this Opt-In Contract is to "assist customers in

understanding how overdraft services provided by their institutions operate .... by explaining the

institution's overdraft service ... in a clear and readily understandable way"—as stated in the

Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the

CFPB's official interpretation of its own regulation," "warrants deference from the courts unless

'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg

E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016)

(quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's

Official Staff Commentary for the Truth In Lending Act's Reg Z).

89.     Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which

requires affirmative consent before a financial institution is permitted to assess overdraft fees

against customer's accounts through an overdraft program for ATM and non-recurring debit card

transactions.  Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements,

including *inter alia* failing to provide its customers with a valid description of the overdraft

program which meets the strictures of 12 C.F.R. § 1005.17.  It did not in its Opt-In contract

describe in a "clear and readily understandable way" that it would be using its APPSN

accounting gimmick to assess overdraft fees on ATM and debit card transactions.

90.     As a result, Defendant has harmed Plaintiff and the Class.

91.     Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and

members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and

costs of suit.

### SIXTH CAUSE OF ACTION
**(For Violation of New York General Business Law § 349)**

92.     The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

93.     By the actions alleged above, Defendant has engaged in deceptive acts or

practices against Plaintiff and the Class members in violation of New York General Business

Law § 349 ("GBL").

94.      Defendant stated it would only charge overdraft (or NSF) fees against its

customers when their accounts did not contain enough available funds in them than was called

24

for by a given transaction.  In reality, Defendant would sequester these funds for a transaction when enough were available for a transaction without going negative, but charged Plaintiff and the Class Members overdraft (and/or NSF fees) when the transaction with the sequestered funds would post.

95.     This practice is deceptive because, *inter alia*, Defendant promised Plaintiffs and the Class members that it would only assess overdraft or NSF fees where the transaction at issue exceeded the actual amount of money in the customer's account, but instead charged fees when the account contained enough money to pay for the transaction in question.  Defendant's conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiffs and Class Members arising from Defendant's unfair practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

96.     Plaintiff alleges that this conduct already has been found by the Consumer Financial Protection Bureau to be both "unfair" and deceptive:"

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.  Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above.  Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged.  Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions.  Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status.  But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by

the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights".

97. The practice described in this cause of action was consumer-oriented. Defendant issued its Account Agreement to all members of the public seeking to become customers of Defendant. Further, the contracts were made available to the public on Defendant's website.

98. Plaintiffs suffered harm from these practices when they were assessed wrongful overdraft and NSF fees.

99. Under § 349(h) Plaintiffs and the Class are entitled to damages and other relief in a form and amount to be determined by a court of law.

## PRAYER

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1. For an order certifying this action as a class action;

2. For compensatory damages on all applicable claims and in an amount to be proven at trial;

3. For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4. For treble damages;

5. For statutory damages;

6. For an order enjoining the wrongful conduct alleged herein;

7. For costs;

8. For pre-judgment and post-judgment interest as provided by law;

9.  For attorneys' fees under New York General Business Law § 349, the common fund doctrine, and all other applicable law and sources; and,

10. For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: August 31, 2020                              Respectfully submitted,

**CHERUNDOLO LAW FIRM, PLLC**

BY:    *s/ John C. Cherundolo*
John Cherundolo
Bar Roll No. 101339
J. Patrick Lannon
Bar Roll No. 516843
AXA Tower I, 17th Floor
100 Madison Street
Syracuse, New York 13202
Telephone (315) 449-9500
Facsimile (315) 449-9804
*plannon@cherundololawfirm.com*

**THE KICK LAW FIRM, APC**
Taras Kick, CA Bar No. 143379*
Taras@kicklawfirm.com
Jeffrey C. Bils, CA Bar No. 301629*
815 Moraga Drive
Los Angeles, California 90049
Telephone: (310) 395-2988
Facsimile: (310) 395-2088
Taras@Kicklawfirm.com

**WILENTZ, GOLDMAN & SPITZER, P.A.**
Kevin P. Roddy – NYSBA # 652585
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686
E-mail:  kroddy@wilentz.com

*Pro Hac Vice* applications to be submitted

Attorneys for Plaintiff Deborah J. Livingston and the Putative Class